## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

_____<br>
                                      )<br>
STEPHEN JIGGETTS,            )<br>
                                        )<br>
          Plaintiff,         )<br>
                                          )<br>
     v.                   )<br>
                                          )<br>
DANIEL CIPULLO and         )<br>
THE DISTRICT OF COLUMBIA,  )<br>
                                          )<br>
         Defendants.      )<br>
_____)

</td><td>

Civil Action No. 15-1951 (RBW)

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

      The plaintiff, Stephen Jiggetts, brings this civil action against Daniel Cipullo, in his capacity as the Director of the Criminal Division of the Superior Court of the District of Columbia ("Superior Court"), and the District of Columbia (collectively, the "defendants"), asserting common law causes of action of false arrest (Count I), false imprisonment (Count II), malicious prosecution (Count III), intentional infliction of emotional distress (Count IV), and slander (Count V), <u>see</u> Fourth Amended Complaint ("4th Am. Compl.") ¶¶ 78–137, as well as federal claims of false arrest and malicious prosecution against Cipullo, pursuant to 42 U.S.C. § 1983 (2018) (Count VII) and <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) (Count VIII).[1]   Currently before the Court is the Defendants' Motion for Summary Judgment ("Defs.' Mot.").  Upon careful consideration of the parties'

---

[1] The Court notes that the Fourth Amended Complaint does not include a Count VI because the plaintiff misnumbered his counts.  To avoid unnecessary confusion, the Court shall retain the numbering used in the Fourth Amended Complaint.

submissions,[2] the Court concludes for the following reasons that it must grant the defendants'

motion for summary judgment as to the plaintiff's <u>Bivens</u> cause of action and deny summary

judgment as to the plaintiff's other claims.

## I.     BACKGROUND

### A.     Factual Background

This case arises from an encounter between the plaintiff and Cipullo, which occurred

outside of the main Superior Court building on the evening of November 6, 2014.  <u>See</u> Pl.'s

Opp'n at 1.  The following facts are relevant to the plaintiff's claims.

### 1.     The November 6, 2014 Encounter Between the Plaintiff and Cipullo

The plaintiff's wife, Tanisha Jiggetts, works with Cipullo at the Superior Court in the

Criminal Division.  <u>See id.</u>, Exhibit ("Ex.") H (Interview with Daniel Cipullo, Director of the

Criminal Division, Superior Court (Nov. 13, 2014) ("Cipullo Interview")) at DC000039.

However, according to Cipullo, the two "don't have the best working relationship."  <u>Id.</u>, Ex. H

(Cipullo Interview) at DC000040.  On November 6, 2014, Cipullo served the plaintiff's wife

with a notice of suspension.  <u>See id.</u>, Ex. H (Cipullo Interview) at DC000039–40.  Thereafter, the

plaintiff's wife called the plaintiff and told him that Cipullo "just detained [her] in [her] office"

and "would not let [her] out."  <u>Id.</u>, Ex. A (Deposition of Stephen Jiggetts (March 22, 2017)

("Stephen Jiggetts Dep.")) 31:14–16.

---

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Defendants' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment ("Defs.' Mem."); (2) the Defendant's Statement of Undisputed Facts ("Defs.' Facts"); (3) the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant[s] District of Columbia and Daniel Cipullo's Motion for Summary Judgment ("Pl.'s Opp'n"); (4) the Plaintiff's Statement of Genuine Issues Setting Forth Material Facts in Dispute ("Pl.'s Facts"); (5) the Defendants' Reply to [the] Plaintiff's Opposition to [the] Defendants' Motion for Summary Judgment ("Defs.' Reply"); and (6) the Defendants' Response to [the] Plaintiff's[ ]Statement of Genuine Issues Setting Forth Material Facts in Dispute ("Defs.' Resp. to Pl.'s Facts").

After receiving this call from his wife, the plaintiff drove to the Superior Court.  See id., Ex. A (Stephens Jiggetts Dep.) 31:19–20.  As he approached the Superior Court in his vehicle, the plaintiff saw Cipullo leaving the courthouse.  See Defs.' Facts ¶ 1.[3]  Upon seeing Cipullo, the plaintiff exited his vehicle and approached Cipullo, see Defs.' Facts ¶ 2; see also Pl.'s Opp'n, Ex. A (Stephens Jiggetts Dep.) 43:3, along with the plaintiff's daughter, who also approached "the scene," Pl.'s Opp'n, Ex. A (Stephens Jiggetts Dep.) 45:20–21.

The plaintiff confronted Cipullo, stating, "Detain me like you detained my wife. Talk to me like you talked to my wife, . . . mother****er."  Defs.' Facts ¶ 3; see also Pl.'s Opp'n, Ex. A (Stephens Jiggetts Dep.) 43:4–8.  According to Cipullo, the plaintiff also threatened to "kick [his] ass," Pl.'s Opp'n, Ex. H (Cipullo Interview) at DC000042; see id., Ex. S (Affidavit in Support of an Arrest Warrant ("Arrest Warrant Affidavit")) at 1 (recording of Cipullo's statement to Metropolitan Police Department ("MPD") officers, in which Cipullo represents that "[the plaintiff] [ ] stated[,] 'you can't threaten my wife, you can't touch my wife.  I'll kick your ass.'"), which the plaintiff denies, see Pl.'s Facts at 2, ¶ 1; see also Pl.'s Opp'n, Ex. A (Stephens Jiggetts Dep.) 44:16–20, 45:2–5.[4]  Cipullo then informed the plaintiff that he was going to call the police, which the plaintiff encouraged him to do.  See Defs.' Facts ¶¶ 4, 8; see also Pl.'s Opp'n, Ex. A (Stephens Jiggetts Dep.) 43:12–14.  At that point, the plaintiff removed his police identification and badge from his back pocket to show Cipullo that he was a retired police

---

[3] The plaintiff only disputes the facts contained in paragraphs 14 and 16 of the Defendants' Statement of Undisputed Facts.  See Pl.'s Facts at 1–2.  Therefore, the Court treats the remaining facts contained in paragraphs 1 to 13, 15, and 17 to 18 of the Defendants' Statement of Undisputed Facts as undisputed for the purpose of ruling on the defendants' motion for summary judgment.  See Fed. R. Civ. P. 56(e); Mason v. Geithner, 811 F. Supp. 2d 128, 174 (D.D.C. 2011), aff'd, 492 F. App'x 122 (D.C. Cir. 2012) ("[W]here 'a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact,' the district court may 'consider the fact undisputed.'" (quoting Fed. R. Civ. P. 56(e))); see also LcvR 7(h).

[4] The plaintiff's daughter, Shantell Jiggetts, provides a consistent account of what the plaintiff testified transpired between Cipullo and himself.  See Pl.'s Opp'n, Ex. B (Deposition of Shantell Jiggetts) at 16:1–22.

officer.  See Defs.' Facts ¶ 5; see also Pl.'s Opp'n, Ex. A (Stephens Jiggetts Dep.) 43:15–18, 44:2–12.

Cipullo called the police as he indicated he was going to do, and because of their close proximity to the MPD headquarters, the plaintiff and Cipullo walked over to the police station together.  See Pl.'s Opp'n, Ex. A (Stephens Jiggetts Dep.) 44:13–45:16.  After the plaintiff and Cipullo reached the police station, the police officers who responded to Cipullo's call separated Cipullo from the plaintiff and his daughter, interviewed them, and declined to arrest the plaintiff, despite Cipullo's request that they do so.  See Pl.'s Facts ¶ 3; see also Pl.'s Opp'n, Ex. A (Stephens Jiggetts Dep.) 54:6–19; id., Ex. H (Cipullo Interview) at DC000043 ("'I'd like to get a warrant for his arrest because he threatened me.' I know I can do this because I work in the courthouse.  The white officer said[,] 'No, we're not going to arrest anyone because you threatened him too, so we're going to write a report.'").  The officers characterized their report of the incident as a miscellaneous report, rather than an offense report, see Pl.'s Opp'n, Ex. C (Deposition of Detective David Gargac (Apr. 26, 2017) ("Gargac Dep.")) 36:5–16, which, according to the one of the officers, meant that the officers, who interviewed Cipullo, the plaintiff, and the plaintiff's daughter, believed that "no crime" had been committed, id., Ex. C (Gargac Dep.) 36:11–12.

### 2.  Cipullo's Alleged Actions Following the November 6, 2014 Encounter

Immediately following the encounter between the plaintiff and Cipullo, while still in MPD headquarters, Cipullo called his supervisor at the Superior Court, Cheryl Bailey, to tell her about the encounter and to ask her to join him at the station.  See Pl.'s Facts ¶ 5; Pl.'s Opp'n, Ex. H (Cipullo Interview) at DC000042–43.  He also called Superior Court Judge Morin to inform him about the encounter.  See Pl.'s Facts ¶ 5; Pl.'s Opp'n, Ex. E (Deposition of Daniel Cipullo Deposition (May 2, 2017) ("Cipullo Dep.")) 62:15–22.  Bailey then contacted the then-Chief

Judge of the Court, Lee Satterfield, and the Court's Chief Security Officer, Richard Parris, to report what had occurred. See id., Ex. F (Deposition of Cheryl Bailey (May 8, 2017) ("Bailey Dep.")) 32:6–15. The next day, a meeting took place between a number of Superior Court officials, including Cipullo, Bailey, and Parris, to determine what to "do going forward." Id., Ex. E (Cipullo Dep.) 65:1–4, 10–15.

On November 13, 2014, Parris interviewed Cipullo regarding what had occurred on November 6, 2014. See Pl.'s Facts ¶ 8; see generally Pl.'s Opp'n, Ex. H (Cipullo Interview). During this interview, Cipullo reported that the plaintiff stated that he was "gonna kick [Cipullo's] ass." Pl.'s Opp'n, Ex. H (Cipullo Interview) at DC000042; see Pl.'s Facts ¶ 8. On November 16, 2014, Parris emailed excerpts from his interview of Cipullo, which included the accusation that Cipullo had been threatened by the plaintiff, to the then-Chief of the MPD, Cathy Lanier; the email was also copied to Chief Judge Satterfield. See Pl.'s Facts ¶ 10; Pl.'s Opp'n, Ex. J (Email Correspondence Between Various Superior Court and MPD Officials ("Superior Court Emails I")) at 2–5; see generally id., Ex. M (Email Correspondence Between Various Superior Court, United States Attorneys' Office, and MPD Officials ("Superior Court Emails II")). Chief Lanier replied to Parris, indicating that she would "look into this." Pl.'s Opp'n, Ex. J (Superior Court Emails I) at 2. MPD Commander William Fitzgerald then responded to Chief Lanier, indicating that he was "not familiar with [the encounter between the plaintiff and Cipullo]," but stated that "once [the] incident is located[,] [he would] have detectives re-interview and apply for a warrant." Id., Ex. J (Superior Court Emails I) at 1; see Pl.'s Facts ¶ 12–13; Pl.'s Opp'n, Ex. K (Deposition of William Fitzgerald (Oct. 17, 2017) ("Fitzgerald Dep.")) 17:8–10.

Commander Fitzgerald then forwarded Chief Lanier's email to Lieutenant Richard Brady, asking if Lieutenant Brady was familiar with the incident.  See Pl.'s Opp'n, Ex. L (Email Correspondence Between MPD Officers ("MPD Emails")) at 4.  Lieutenant Brady responded that "[t]he report was taken for miscellaneous[,] . . . I will have it assigned to determine if threats occurred."  Id., Ex. L (MPD Emails) at 2.  He also attached a copy of the report to his email.  See id., Ex. L (MPD Emails) at 2.  Chief Lanier then emailed Commander Fitzgerald, stating: "This looks nothing like the claim I got.  Either way [the] [C]hief [J]udge is threatening to bar all MPD [officers] and other armed [officers] from court."  Id., Ex. L (MPD Emails) at 2; see Pl.'s Facts ¶ 14.  Commander Fitzgerald replied that he "agree[d] [the report] doesn[']t match the events described in [] Cipullo's email" and informed Chief Lanier that a detective would "interview [] Cipullo [] and prepare an offense report and initiate [an] investigation."  Pl.'s Opp'n, Ex. L (MPD Emails) at 1–2.

On that same day, Chief Judge Satterfield responded to Parris's email containing the excerpts of Cipullo's interview and sent copies of his email to the then-United States Attorney for the District of Columbia Ronald Machen and Chief Lanier.  See generally id., Ex. M (Superior Court Emails II); see Pl.'s Facts ¶ 117.  Chief Judge Satterfield urged in his email that there be a swift resolution of the problem and stated: "[i]f this can't be done then all police officers coming into the building will have to be screened or barred if we can[]not identify [the plaintiff]."  Pl.'s Opp'n, Ex. M (Superior Court Emails II) at 1; see Pl.'s Facts ¶ 15.  In response to Chief Judge Satterfield's email, United States Attorney Machen replied that Cipullo's accusations were "obviously a serious matter" and promised to have "someone follow up with [] Cipullo regarding the incident."  Pl.'s Opp'n, Ex. M (Superior Court Emails II) at 1; see Pl.'s Facts ¶ 18.  Chief Lanier also replied to Chief Judge Satterfield's email, stating that her officers

were "following up as we speak." Pl.'s Opp'n, Ex. N (Email Correspondence Between Various Superior Court and MPD Officials ("Superior Court Emails III")) at 1. Later that night, Chief Judge Satterfield forwarded the responses from United States Attorney Machen and Chief Lanier to Cipullo, see id., Ex. M (Court Emails II) at 1; id., Ex. N (Superior Court Emails III) at 1, who thanked Chief Judge Satterfield "for [his] support in th[e] matter," id., Ex. N (Superior Court Emails III) at 1; see Pl.'s Facts ¶ 19.

The following day, on November 17, 2014, eleven days after the November 6, 2014 encounter between the plaintiff and Cipullo, Detectives David Gargac and Charles Viggiani of the MPD interviewed the plaintiff and his daughter separately, see Pl.'s Opp'n, Ex. S (Arrest Warrant Affidavit) at 2–3, and during the course of the plaintiff's interview, the detectives informed the plaintiff that he was "the subject of an investigation" in "the case between [him] and Cipullo," id., Ex. A (Stephens Jiggetts Dep.) 73:12, 15–16.

### 3. The Plaintiff's Arrest and Prosecution

On November 20, 2014, Cipullo emailed Chief Judge Satterfield and stated: "I just got a call from the [United States Attorney's Office] and they will be filing for an arrest warrant today. Just wanted to let you know. Thanks again for all your support." Id., Ex. O (Email Correspondence Between Cipullo and Chief Judge Satterfield) at DC000029; see Pl.'s Facts ¶ 20. Chief Judge Satterfield responded: "Wow, when police don't police their own go to the prosecutor." Pl.'s Opp'n, Ex. O (Email Correspondence Between Cipullo and Chief Judge Satterfield) at DC000029; see Pl.'s Facts ¶ 21. That same day, the plaintiff was charged with felony threats under D.C. Code § 22-1810, and a warrant was issued for his arrest. Pl.'s Opp'n, Ex. S (Arrest Warrant Affidavit) at 1. The plaintiff subsequently surrendered himself to the MPD the following morning, id., Ex. A (Stephen Jiggetts Dep.) 96:17–20, and was detained for "over ten hours," Pl.'s Facts ¶ 26.

On February 26, 2015, the plaintiff entered into a deferred prosecution agreement with the United States Attorney's Office. See id. ¶ 29; see generally Pl.'s Opp'n, Ex. P (Deferred Prosecution Agreement). In accordance with the deferred prosecution agreement, the United States Attorney dismissed the charges against the plaintiff with prejudice on October 30, 2015, see Pl.'s Opp'n, Ex. Q (Corrected Order to Seal Public Criminal Records ("Order to Seal")) at 1, 3, and in his Order to Seal, Superior Court Judge Neal Kravitz "credit[ed] [the] [plaintiff's] version of the events that led up to [the plaintiff's] arrest, and [found] by a preponderance of the evidence that the [plaintiff] did not commit the offense for which he was arrested," id., Ex. Q (Order to Seal) at 1. Judge Kravitz therefore ordered the sealing of the records in the plaintiff's criminal case. Id., Ex. Q (Order to Seal) at 1.

**B.    Procedural Background**

The plaintiff filed this action against Cipullo on November 3, 2015. See Complaint at 1. On May 23, 2016, the Court granted the plaintiff's unopposed motion to amend his complaint to add the District of Columbia, Cipullo's employer, as a defendant based on the liability theory of respondeat superior, see Order at 1 (May 23, 2016), ECF No. 10, and the plaintiff filed his Amended Complaint that same day, see generally Amended Complaint. In light of information uncovered during discovery, the Court granted the plaintiff permission to further amend his complaint to add federal causes of action against Cipullo, but not against the District, see Jiggetts v. Cipullo, 285 F. Supp. 3d 156, 173 (D.D.C. 2015) (Walton, J.), which the plaintiff did on September 22, 2017, see generally Third Amended Complaint and Jury Demand. And on January 26, 2018, the plaintiff filed his Fourth Amended Complaint, which is now the operative complaint in this case. See 4th Am. Compl. at 1. After discovery closed on March 13, 2018, see Order at 1 (Feb. 20, 2018), ECF No. 61, the defendants jointly filed a motion for summary

judgment on May 31, 2018, see Defs.' Mot. at 1, which is opposed by the plaintiff, see generally Pl.'s Opp'n. This motion is the subject of this Memorandum Opinion.

## II. STANDARD OF REVIEW

A court can grant a Rule 56 motion for summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Id. The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the non-moving party "must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion for summary judgment; rather, "there

must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

### III.   ANALYSIS

The defendants argue that judgment should be entered in their favor on all of the plaintiff's claims because "[the p]laintiff's constitutional claim under 42 U.S.C. § 1983 against [] Cipullo fails because he was not a state actor at the time of the[] [relevant] events," Defs.' Mot. at 1; see Defs.' Mem. at 8–11; (2) "to the extent the Court finds [that Cipullo was a state actor], he is entitled to qualified immunity," Defs.' Mot. at 1; see Defs.' Mem. at 11–13; (3) "[the p]laintiff's common law claims either fail for lack of proof or cannot be maintained against the District based on [the p]laintiff's failure to comply with D.C. Code § 12-309," Defs.' Mot. at 1; see Defs.' Mem. at 13–21; and (4) "[the p]laintiff's Bivens claim cannot be maintained against [] Cipullo because he is not a federal actor," Defs.' Mot. at 1; see Defs.' Mem. at 6–8.[5]  The Court will address each argument in turn.

---

[5] The defendants also argue that "[the p]laintiff's claims as related to [his] arrest and prosecution are not actionable," Defs.' Mot. at 1; see Defs.' Mem. at 5–6, because he "now occupies the legal status of a person who was not arrested or charged for the events that occurred on November 6, 2014," Defs.' Mem. at 6.  Because the defendants fail to cite any legal authority in support of this argument, the Court cannot conclude that the defendants are entitled to a favorable finding on this argument.  However, to the extent that the defendants are asserting a challenge to the plaintiff's standing, the showing of which "'is an essential and unchanging' predicate to any exercise of [federal] jurisdiction," Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (alteration in original) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)), the Court finds that the plaintiff has standing despite having his criminal records sealed.  See Pl.'s Opp'n, Ex. Q (Order to Seal) at 1.  To establish Article III standing, a plaintiff must show that (1) he has suffered an "injury in fact," (2) that the injury is "fairly traceable" to the challenged action of the defendant, and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Lujan, 504 U.S. at 560–61.  As the plaintiff correctly points out, he "is not in the same position as someone who was never arrested.  He is in the position of a man who [allegedly] was unlawfully arrested, [ ] incarcerated for over ten hours, had existing injuries exacerbated by his incarceration, [and] was forced to undergo costly court proceedings."  Pl.'s Opp'n at 17–18.  The plaintiff has presented evidence that he was not only injured physically and psychologically as a result of his alleged unlawful detention but also incurred legal fees as a result of defending against his criminal charges, all of which was caused by Cipullo's purported false statements to the police.  Id., Ex. A (Stephen Jiggetts Dep.) 192:1–21, 194:12–16, 200:14–22, 202:6–203:8.  Thus, the Court concludes that the defendants have failed to demonstrate that the plaintiff lacks standing to bring his claims.

**A.    Liability under 42 U.S.C. § 1983 (Count VII)**

The plaintiff asserts that Cipullo is "a state actor within the meaning of 42 U.S.C.

§ 1983," 4th Am. Compl. ¶ 141, who "used his position and authority as a Director of the

Superior Court of the District of Columbia Criminal Division," id. ¶ 142, to deprive the plaintiff

"of clearly established rights protected by the Fourth Amendment to the [United States]

Constitution," id. ¶ 140.  Specifically, the plaintiff alleges that Cipullo violated the plaintiff's

Fourth Amendment right "to be free from unreasonable restrictions on his liberty interests," id.

¶ 142, when he "intentionally gave false statements to police officers [and] prosecutors," while

"acting under color of his authority" as a Superior Court official, id. ¶ 143, which caused the

plaintiff to be "arrested and detained absent a valid, truthful, or lawful basis," id. ¶ 148.  The

defendants argue that the plaintiff's Section 1983 claims fail because "during the time giving rise

to this action," Cipullo was not a state actor, see Defs.' Mem. at 8–11, and even if this Court

finds that Cipullo acted under color of state law, "he would be entitled to qualified immunity,"

see id. at 11–13.  The Court addresses the defendants' arguments in turn.

**1.    Acting Under Color of State Law**

To recover under 42 U.S.C.  § 1983, a plaintiff must show that a defendant "depriv[ed]

[him] of a[] right[] . . . secured by the Constitution and laws" of the United States, 42 U.S.C.

§ 1983, while acting under color of state law,[6] see id.; see also Tower v. Glover, 467 U.S. 914,

919 (1984); Jones v. Nat'l Inst. of Health Police Dep't, 404 F. Supp. 2d 1, 2 (D.D.C. 2005).  A

defendant acts under color of state law if his alleged illegal action was an exercise of power

"possessed by virtue of state law and made possible only because the wrongdoer is clothed with

---

[6] The District of Columbia is considered a "state" for purposes of a Section 1983 claim.  See 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, [or] regulation . . . of . . . the District of Columbia, subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."); see also Boyd v. District of Columbia, 526 F. Supp. 2d 44, 48 n.3 (D.D.C. 2007) ("For the purposes of § 1983, the District of Columbia is treated as a state.").

the authority of state law." West v. Atkins, 487 U.S. 42, 49 (1988) (internal quotation marks omitted). As recognized by the Supreme Court, if a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, "that conduct [is] also action under color of state law and will support a suit under § 1983." Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982). Accordingly, "a challenged activity may be state action . . . when a private actor operates as a willful participant in joint activity with the State or its agents," Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296 (2001) (internal quotation marks and citations omitted); see Hoai v. Vo, 935 F.2d 308, 313 (D.C. Cir. 1991), and the crux of the inquiry depends on whether "there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself,'" Brentwood, 531 U.S. at 295 (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)).

Here, the defendants argue that "[the p]laintiff has presented no proof that [] Cipullo [wa]s a state actor," Defs.' Mem. at 10, and maintain that Cipullo, during the events giving rise to this lawsuit, was acting as a private citizen, see Defs.' Mem. at 9–11; see also Defs.' Reply at 4–10. Although the Court agrees with the defendants that the evidence presented by the plaintiff does not suggest that Cipullo was acting under color of law on November 6, 2014, during Cipullo's encounter with the plaintiff and his subsequent police interview later that evening, id. at 9–11, the Court disagrees with the defendants that "there is no evidence showing that [] Cipullo used his role as Director to take any further action against the [p]laintiff or that he was clothed with state action because of any communications he had with others," Defs.' Reply at 7. Therefore, the Court concludes that, from the evidence currently in the record, a reasonable jury could find that the plaintiff's arrest was caused by actions jointly taken by Cipullo and state actors.

Although the plaintiff does not cite, and the Court is not able to locate, any statutory or other legal authority regarding whether a Superior Court employee, occupying a position analogous to Cipullo's, is a state actor for the purposes of Section 1983, and while the defendants are correct that "working for the government, by itself, does not clothe[] a person with state action," Defs.' Mem. at 8, the Court nonetheless finds that a genuine issue of material fact exists regarding whether Cipullo "operate[d] as a willful participant in joint activity with the State or its agents" to cause the plaintiff's arrest, Brentwood, 531 U.S. at 296. For example, the plaintiff has produced evidence showing that after the police informed Cipullo that they would not arrest the plaintiff, see Pl.'s Opp'n, Ex. H (Cipullo Interview) at DC000043, Cipullo contacted numerous government officials within the Superior Court, including judges, id., Ex. E (Cipullo Dep.) 62:1–13, 62:16–22, to discuss his encounter with the plaintiff, allegedly misrepresented to them that the plaintiff threatened him, see Defs.' Resp. to Pl.'s Facts at 8–9, and attended several meetings with high ranking Superior Court officials during which he described being threatened by the plaintiff, see Pl.'s Opp'n, Ex. E (Cipullo Dep.) 65:1–15; id., Ex. F (Bailey Dep.) 45:3–22; Defs.' Reply at 7. The plaintiff has also produced evidence that as a result of these communications, these Superior Court officials began contacting other government officials on behalf of Cipullo regarding the plaintiff's alleged threat. See Pl.'s Facts ¶ 10; Pl.'s Opp'n, Ex. J (Emails Between Various Superior Court and MPD Officials ("Superior Court Emails I")) at 2–5; see generally id., Ex. M (Email Correspondence Between Various Superior Court, United States Attorneys' Office, and MPD Officials ("Superior Court Emails II")). These facts are material because a reasonable jury could find that these actions—Cipullo's initial alleged misrepresentation that the plaintiff threatened him and the subsequent reiteration of Cipullo's misrepresentation by a number of Superior Court officials—ultimately caused the plaintiff's arrest and subsequent

prosecution.  See Hoai, 935 F.2d at 313 ("[T]he 'joint activity' theory of section 1983 liability

continues to require, at a minimum, some overt and significant state participation in the

challenged action.").  And, a reasonable jury could further conclude that the plaintiff's arrest was

caused by Cipullo's joint action with other Superior Court officials.  In fact, the evidence

suggests that the police considered their investigation into the November 6, 2014 encounter

closed until they received a transcript of Cipullo's interview with the Superior Court's Chief

Security Officer, Richard Parris, on November 13, 2014.  Compare id., Ex. E (Cipullo Dep.)

70:9–15 (testifying that the police took no action following the November 6, 2014 encounter),

and id., Ex. L (MPD Emails) at 2 (noting that the report taken by the officers who responded to

the November 6, 2014 encounter had been labeled "miscellaneous"), with id., Ex. S (Arrest

Warrant Affidavit) at 4 (affidavit for arrest filed on November 20, 2014, four days after receipt

of the Parris transcripts), and id., Ex. K (Fitzgerald Dep.) 17:5–21 (testifying that he would

"apply for a warrant" after reading the transcripts provide by Parris).  Thus, the question of

whether Cipullo acted from purely personal motivation or "willfully engage[d] in joint activity

with a state or its agents" is a factual determination that must be made by a jury.  Hoai, 935 F.2d

at 313.

The defendants' counterarguments are unavailing.  They contend that "[t]he mere fact

that you hold a certain position should not prevent you from availing yourself of the laws of the

state in which you work and reside to seek redress when you believe you have been harmed,"

Defs.' Reply at 7; see Defs.' Mem. at 10–11 ("[A]ny citizen can call Congress, can call someone

they know who knows someone in authority or can take other action to make requests or even

actually apply pressure on others; it does not mean they are or have become state actors."), and

that if Cipullo's actions were deemed to have been taken under color of state law, it "would strip

. . . employees of the ability to inform others, including supervisors, about an unnerving set of events that happened to them or to notify others of safety concerns they had," and as a result, "any employee, including courtroom clerks, bailiffs, secretaries, cleaning personnel, or others at the Superior Court, who have regular contact with high level officials, including judges, including those who report[] to judges or who interact with the Executive Office of the Superior Court, will always be a state actor," Defs.' Reply at 7. The Court disagrees. There is a distinct difference between informing individuals with whom one works about an unnerving event or safety concern, as compared to taking actions to allegedly improperly cause someone's arrest. In fact, the evidence presented by the plaintiff shows that Cipullo did not merely resort to "recourse to state or local court procedures," Hoai, 935 F.2d at 313 ("[M]ere recourse to state or local court procedures does not by itself constitute 'joint activity' with the state sufficient to subject a private party to liability under section 1983."), but rather he and other Superior Court officials with whom he worked were actively "involved in the . . . decision to arrest and prosecute [the plaintiff]," Parker v. Grand Hyatt Hotel, 124 F. Supp. 2d 79, 88 (D.D.C. 2000); cf. id. (finding that "calling the police, alone, does not establish joint action between the police and the private caller," and that the plaintiff had "offered no evidence showing that [the defendant] was involved in the police officers' decision to arrest and prosecute [the plaintiff]" (citation omitted)). The defendants also claim that Cipullo's authority was no different from that of "any other citizen." Def.'s Mem. at 10. This argument is undermined by the evidence suggesting that after the police initially declined to arrest the plaintiff on November 6, 2014, see Pl.'s Opp'n, Ex. E (Cipullo Dep.) 70:9–15, Cipullo took a series of actions unavailable to the average citizen, such as contacting judges directly and arranging for a series of meetings with high ranking Superior Court officials, see Defs.' Resp. to Pl.'s Facts at 9, and those actions caused the police to reverse

course and arrest the plaintiff, see Pl.'s Facts ¶ 12–14; see generally Pl.'s Opp'n, Ex. J (Superior Court Emails I); id., Ex. L (MPD Emails); id., Ex. M (Superior Court Emails II).

At this stage of the litigation, the Court must view the evidence in the light most favorable to the plaintiff, and draw all reasonable inferences in his favor. See Rogers v. England, 362 F. Supp. 2d 269, 270 (D.D.C. 2005). Applying this standard, the Court is compelled to find that genuine disputes of material fact exist regarding whether Cipullo "operate[d] as a willful participant in joint activity with the state or its agent," Brentwood, 531 U.S. at 296, and therefore, cannot conclude as a matter of law that Cipullo was not acting under color of law.

## 2. Qualified Immunity

Because the Court holds that a reasonable jury could conclude that Cipullo acted under color of law, the Court must also address the defendants' argument that Cipullo is nonetheless not liable to the plaintiff because he is entitled to qualified immunity. See Defs.' Mem. at 12. The doctrine of qualified immunity shields state officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citation omitted). Thus, a defendant is not entitled to qualified immunity if (1) the defendant's conduct violated a constitutional right, and (2) the right was "clearly established at the time." Id. at 231. A right is "clearly established" if, at the time of the defendant's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011) (alteration omitted) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). However, "the protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, 'a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson, 555 U.S. at 231 (citation omitted). Once a defendant asserts the defense of qualified immunity, the burden then falls to

the plaintiff to show that the official is not entitled to the protection afforded by qualified immunity. Winder v. Erste, 905 F. Supp. 2d 19, 27–28 (D.D.C. 2012).

Here, the plaintiff has asserted constitutional claims of false arrest and malicious prosecution. See 4th Am. Compl. ¶¶ 138–76. The defendants argue that Cipullo is entitled to qualified immunity as to these claims because he did not violate the plaintiff's constitutional rights, see Defs.' Reply at 10–11, and because "it cannot be said that there was a clearly established law [making] his conduct [] unlawful," id. at 12; see also Defs.' Mem. at 12–13. Because the Court concludes that genuine issues of material fact exist that prevent the Court from deciding, as a matter of law, whether Cipullo's conduct violated the plaintiff's Fourth Amendment rights and whether it was objectively reasonable for Cipullo to believe that his conduct was lawful, the Court must deny the defendants summary judgment based on their qualified immunity argument.

The Fourth Amendment of the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Thus, it prohibits, except in exceptional circumstances, see United States v. Anderson, 533 F.2d 1210, 1216 (D.C. Cir. 1976) (quoting United States v. Watson, 423 U.S. 411 (1976) (Powell, J., concurring)), "searches and seizures . . . without a [valid] warrant." Groh v. Ramirez, 540 U.S. 551, 558–59 (2004). To establish a false arrest in violation of the Fourth Amendment, a plaintiff must show: "(1) detention or restraint against one's will within boundaries fixed by the defendant, and (2) the unlawfulness of such restraint." Harris v. U.S. Dep't of Veterans Affairs, 776 F.3d 907, 911–12 (D.C. Cir. 2015). Whether an arrest is unlawful depends on whether probable cause existed. See Olaniyi v. District of Columbia, 876 F. Supp. 2d 39, 53 (D.D.C. 2012) (Walton, J.) ("The detention of a plaintiff by a defendant police officer

is lawful if the officer effected the detention constitutionally—that is, with probable cause if the detention was an arrest." (quoting Zhi Chen v. District of Columbia, 808 F. Supp. 2d 252, 257 (D.D.C. 2011)).  Similarly, a claim for malicious prosecution is actionable as a constitutional tort "to the extent that the defendant's actions cause the plaintiff to be 'seized' without probable cause."  Pitt v. District of Columbia, 491 F.3d 494, 510 (D.C. Cir. 2007).  An arrest pursuant to a valid warrant typically provides no basis for a false arrest claim because "the fact that a neutral magistrate has issued a warrant is the clearest indication that the [arresting] officers acted in an objectively reasonable manner."  Messerschmidt v. Millender, 565 U.S. 535, 546 (2012) (finding that an officer is entitled to qualified immunity "[w]here the alleged Fourth Amendment violation involves a . . . seizure pursuant to a warrant").  As the Supreme Court has explained, "'in the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination' because 'it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.'"  Id. at 547 (alterations omitted) (quoting United States v. Leon, 468 U.S. 897, 921 (1984)).  Nevertheless, the deference given to a warrant "gives way when the affidavit upon which the magistrate relied 'contain[ed] a deliberately or recklessly false statement,'" Lane v. District of Columbia, 211 F. Supp. 3d 150, 173 (D.D.C. 2016) (quoting Franks v. Delaware, 438 U.S. 154, 165 (1978)); see Malley v. Briggs, 475 U.S. 335, 341 (1986) (recognizing an exception allowing suit when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue"), and those false statements were "material," Lane, 211 F. Supp. 3d at 173.  "[A]llegedly false information in an affidavit is material only if, when it is 'set to one side, the affidavit's remaining content is insufficient to establish probable

cause.'" United States v. Ali, 870 F. Supp. 2d 10, 27 (D.D.C. 2012) (quoting Franks, 438 U.S. at 156).

The Court acknowledges that a defendant's entitlement to qualified immunity is a question of law to be decided by the Court. See Pitt, 491 F.3d at 509 (citing Hunter v. Bryant, 502 U.S. 224, 224–27 (1991)). However, the plaintiff raises a genuine factual dispute regarding whether the warrant for his arrest was valid, i.e., whether probable cause existed to arrest him, which is fatal to the defendants' motion for summary judgment as to both prongs of the qualified immunity inquiry. Specifically, the plaintiff denies that he threatened Cipullo on November 6, 2014, and therefore, disputes the factual predicate underlying the probable cause determination for the issuance of the warrant for his arrest. See Pl.'s Opp'n, Ex. A (Stephen Jiggetts Dep.) at 44. The defendants, on the other hand, claim that "[] Cipullo felt threatened" when the plaintiff approached him outside the courthouse and allegedly threatened him. Defs.' Mem. at 12. As a result of these competing versions of the encounter, the "Court is presented with 'a classic "he said, she said" (in this case "he said, he said") situation in which summary judgment is inappropriate because the facts are in diametric opposition.'" Barnhardt v. District of Columbia, 723 F. Supp. 2d 197, 215 (D.D.C. 2010) (quoting Jones v. Tozzi, Civ. Action No. 05-0148, 2007 WL 433116, at *11 (E.D.Cal. Feb. 7, 2007)). Thus, the Court finds that "[r]esolution of these factual issues depends on credibility determinations," which must be resolved by a jury. Id. at 15–16. Therefore, the Court concludes that the question of what actually transpired between the plaintiff and Cipullo on November 6, 2014, presents a genuine factual dispute that prevents the Court from deciding, as a matter of law, whether the warrant for the plaintiff's arrest immunizes Cipullo from liability and therefore precludes the Court from granting the defendants' summary judgment motion based on the defendants' qualified immunity argument.

The defendants' counterarguments do not compel a different result for the following reasons.  With respect to the first prong of the qualified immunity inquiry, the defendants claim that "there is no showing that the report made by [] Cipullo about [the p]laintiff's comments violated his Fourth Amendment rights."  Defs.' Reply at 11.  In addition, they claim that Cipullo did not violate the plaintiff's constitutional rights because he did not "procur[e] [the plaintiff's] arrest," id. at 11, and that "the record is devoid of any evidence that [the p]laintiff's arrest was based on any influence by [] Cipullo,"  Defs.' Mem. at 17.  However, the defendants fail to acknowledge, for example, that "an informer who knowingly gives false information to a police officer necessarily interferes with the intelligent exercise of the officer's independent judgment and discretion and thereby becomes liable for a false arrest that later occurs."  Vessels v. District of Columbia, 531 A.2d 1016, 1020 (D.C. 1987); see Smith v. District of Columbia, 399 A.2d 213, 218 (D.C. 1979) ("Liability is incurred for the procuring of a false arrest and imprisonment if by acts or words, one directs, requests, invites[,] or encourages the unlawful detention of another.").  And, a reasonable jury could find, if it credits the plaintiff's version of events, that by falsely reporting the events of November 6, 2014, to the police, Cipullo "interfere[d] with the intelligent exercise of the officer's [the prosecutor's, and the judge's] independent judgment[s] and discretion and thereby [is] liable for [the] false arrest that later occur[ed]."  Vessels, 531 A.2d at 1020 (finding that "[t]o consciously misstate the facts under such circumstances must be for the purpose of inducing action by the police") (citation and internal quotation marks omitted)).  The defendants further claim that "the evidence in this case shows that [the p]laintiff was not arrested solely because of [Cipullo's] specific comments."  Defs.' Reply at 11. However, viewing the facts in a light most favorable to the plaintiff, the Court finds that a reasonable jury could conclude that the only statement in the affidavit in support of the arrest

warrant that supports the finding of probable cause to arrest and prosecute the plaintiff for the crime of felony threats is Cipullo's statement that the plaintiff threatened to "kick his ass" and find that this statement was exclusively relied upon to procure the plaintiff's arrest and precipitated the criminal proceedings initiated against him.

The defendants also claim that the plaintiff "conceded" that "probable cause existed for his arrest" when "he agreed to the deferred prosecution agreement." Defs.' Mem. at 18 (citing Defs.' Mot., Ex. B (Deferred Prosecution Agreement (Feb. 26, 2015) ("Deferred Prosecution Agreement"))). However, the deferred prosecution agreement, by its own terms, did not amount to a concession by the plaintiff that there was probable cause for his arrest, but rather "acknowledged that the Magistrate Judge determined that there [was] probable cause for the Court to conclude that the defendant committed the charged offense(s)." Defs.' Mot., Ex. B (Deferred Prosecution Agreement) at 2. Acknowledging that the Magistrate Judge determined that probable cause existed is not equivalent to agreeing that probable cause existed. See Am. Gas Ass'n v. Fed. Energy Regulatory Comm'n, 593 F.3d 14, 20 (D.C. Cir. 2010) (suggesting that "acknowledging" and "agreeing" are two distinct actions).

With respect to the second prong of the qualified immunity inquiry, the defendants argue that "[e]ven if [] Cipullo was mistaken in that [the p]laintiff did not intend to threaten him, [he] would be entitled to qualified immunity" because "it applies regardless of whether [a] government official's error is . . . [a] mistake of fact." Defs.' Mem. at 12. However, contrary to the defendants' argument, a reasonable jury could conclude, if it credits the plaintiff's version of what transpired on November 6, 2014, that Cipullo acted maliciously, or at least with a reckless disregard for the truth, in stating that the plaintiff threatened him. See Franks, 438 U.S. at 171; Amobi v. D.C. Dep't of Corr., 755 F.3d 980, 993 (D.C. Cir. 2014) (finding that the defendants'

"[f]ailing to disclose . . . material facts evinces a lack of good faith"); Pitt v. District of

Columbia, 491 F.3d 494, 504 (D.C. Cir. 2007) ("[A] reasonable jury could have concluded that

[the defendants] acted with malice because the arrest report and the affidavit submitted to

prosecutors contained several material misstatements and omissions.").  Moreover, if Cipullo's

statement about what the plaintiff said to him was made under such circumstances, this would be

material because a reasonable jury could conclude that, in the absence of Cipullo's claim that the

plaintiff threatened him, the warrant would no longer be supported by probable cause and would

therefore not be entitled to this Court's deference.  See Franks, 438 U.S. at 165.

The defendants further argue that "it cannot be said that there was a clearly established

law that [made] [Cipullo's] conduct [ ] unlawful."[7]  Defs.' Reply at 12.  The Court disagrees.

With respect to determining whether a right is clearly established, a court must look to Supreme

Court rulings and "cases of controlling authority in [its] jurisdiction." Wilson v. Layne, 526 U.S.

603, 617 (1999).  "It is well settled that an arrest without probable cause[, i.e., a false arrest,]

violates the [F]ourth [A]mendment."  Martin v. Malhoyt, 830 F.2d 237, 262 (D.C. Cir. 1987)

(citing Gerstein v. Pugh, 420 U.S. 103, 111 (1975)).  And although an arrest pursuant to a valid

warrant typically provides no basis for a false arrest claim because "the fact that a neutral

magistrate has issued a warrant is the clearest indication that the [arresting] officers acted in an

objectively reasonable manner," Messerschmidt, 565 U.S. at 546, "[t]he weight of authority

holds that an informer who knowingly gives false information to a police officer necessarily

---

[7] The defendants argue that "[the p]laintiff cites no law that [] Cipullo was on notice that his actions could be a violation of the [C]onstitution."  Defs.' Reply at 12; see id. ("[W]ith respect to [the p]laintiff's malicious prosecution claim, given that [] Cipullo did not testify against [the p]laintiff . . . , he would not be on notice that any of his actions caused [the p]laintiff's prosecution in violation of his constitutional rights.").  However, "[i]t is no defense that an official was unaware of a law, as a 'reasonably competent public official should know the law governing his conduct.'" Barham v. Ramsey, 338 F. Supp. 2d 48, 55 (D.D.C. 2004) (quoting Harlow, 457 U.S. at 818–19).  And, making a false statement to cause a person to be arrested is surely something a reasonably competent public official should know amounts to a constitutional violation.

interferes with the intelligent exercise of the officer's independent judgment and discretion and thereby becomes liable for a false arrest that later occurs," Vessels, 531 A.2d at 1020. Furthermore, this Circuit has held that a malicious prosecution, like a false arrest, which "cause[s] the plaintiff to be unreasonably 'seized' without probable cause," violates the Fourth Amendment. Pitt, 491 F.3d at 511. Because the plaintiff has created a genuine factual dispute as to whether these clearly established constitutional rights were violated due to the absence of a valid probable cause to arrest him, the Court is precluded from determining whether, as a matter of law, it was objectively reasonable for Cipullo to believe that his conduct was lawful.

Therefore, the genuine factual dispute regarding whether the plaintiff threatened Cipullo on November 6, 2014, prevents the Court from determining, at this stage of the proceedings, whether, as a matter of law, the warrant for the plaintiff's arrest validly establishes probable cause and immunizes Cipullo from liability. Cf. Amobi, 755 F.3d 980, 992 (D.C. Cir. 2014) (holding that the defendant officers who misstated the information underlying the basis for the plaintiff's arrest warrant were not entitled to summary judgment on the plaintiff's false arrest claim because "[f]ailing to disclose . . . material facts evinces a lack of good faith"); Mazloum v. D.C. Metro. Police Dep't, 576 F. Supp. 2d 25, 34–35 (D.D.C. 2008) ("The jury, then, might reasonably have decided that—given the facts known to the officers at the time (as construed by the jury)—the officers could not have credibly determined that [the plaintiff] . . . had committed or was about to commit a crime."). Accordingly, the Court denies the defendants' summary judgment motion based on their argument that Cipullo is entitled to qualified immunity.

## B.    The Plaintiff's Common Law Claims

The plaintiff brings common law claims of false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress, and slander against both defendants.[8]  As an initial matter, the defendants argue that the "[p]laintiff's common law tort[] [claims] . . . are barred against the District under D.C. Code § 12-309."  Defs.' Mem. at 13.  Under this section of the D.C. Code, a plaintiff cannot pursue an action against the District for unliquidated damages[9] "unless, within six months after the injury or damage was sustained, the [plaintiff] . . . has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage."  D.C. Code § 12-309.  "[C]ourts generally 'resolve doubts in favor of finding compliance with the statute.'"  Maddux v. District of Columbia, 144 F. Supp. 3d 131, 148 (D.D.C. 2015) (quoting Wharton v. District of Columbia, 666 A.2d 1227, 1230 (D.C. 1995)).

Here, it is undisputed that the plaintiff timely sent a letter to the Mayor regarding his encounter with Cipullo.  See Defs.' Mem. at 15; see also Pl.'s Opp'n, Ex. R (Letter Titled "Claim Pursuant to D.C. Code §[ ]12-309" ("Notice Letter")).  Nonetheless. the defendants argue that his letter did "not put the District on notice of [the p]laintiff's potential claims."  Defs.' Mem. at 15.  Specifically, they argue that the letter did not "describe or [ ] mention [the plaintiff's] prosecution[] or that he intends to proceed on claims for malicious prosecution, slander, false arrest, false imprisonment, or intentional infliction of emotional distress," or

---

[8] The plaintiff brings his claims against the District on the theory that it is vicariously liable for Cipullo's actions.  See 4th Am. Compl. ¶¶ 90, 102, 116, 127, 136.  Because the District does not challenge this theory, the Court need not address it.

[9] Damages are considered liquidated if, at the time they arose, they were "an easily ascertainable sum certain."  Hartford Acc. & Indem. Co. v. District of Columbia, 441 A.2d 969, 974 (D.C. 1982) (quoting Kiser v. Huge, 517 F.2d 1237, 1251 (D.C. Cir. 1974)).  Because the plaintiff seeks to recover unliquidated damages, see 4th Am. Compl. ¶¶ 91, 103, 117, 128, 137, compliance with Section 12-309 was mandatory in this case.

"allege any injury result[ed] from any of the alleged torts," id. However, "[a]s a legal matter, § 12–309 simply does not require the specificity demanded by [the d]efendant—i.e., identification of the precise legal theory upon which a plaintiff seeks relief." Shaw v. District of Columbia, Civ. Action No. 05-1284, 2006 WL 1274765, at *7 (D.D.C. May 8, 2006). Instead, the plaintiff's letter need only "recite[] facts from which it could be reasonably anticipated that a claim against the District might arise." Pitts v. District of Columbia, 391 A.2d 803,09 (D.C. 1978); see Spiller v. District of Columbia, 302 F. Supp. 3d 240, 253 (D.D.C. 2018) ("What matters is that the notice 'describe[ ] the injuring event with sufficient detail to reveal, in itself, a basis for the District's potential liability.'" (emphasis omitted) (quoting Washington v. District of Columbia, 429 A.2d 1362, 1366 (D.C. 1981))). And the plaintiff's letter does just that—it describes the facts and circumstances from which his claims arise, including his allegation that Cipullo "called the police and falsely reported that [the plaintiff] threatened him," Pl.'s Opp'n, Ex. R (Notice Letter) at 1, which, as the plaintiff correctly points out, "form[s] the basis of all of [the p]laintiff's tort claims," Pl.'s Opp'n at 23.

Additionally, the plaintiff's letter states that Detective "Gargac solely relied on Cipullo's account of the events," Pl.'s Opp'n, Ex. R (Notice Letter) at 1, and, as the defendants acknowledge, "notifies the District that [the plaintiff's] potential claims stem from the negligent [and defective] investigations committed by . . . Detective [ ] Gargac, which solely caused him to be falsely accused of threatening Cipullo," Defs.' Mem. at 15; see Pl.'s Opp'n, Ex. R (Notice Letter) at 1. The plaintiff's letter also indicates that "[a] warrant was subsequently issued for [the plaintiff's] arrest" and he "was charged with felony threats." Defs.' Mot., Ex. D (Notice Letter). The Court concludes that this information sufficiently informed the District of the details of the cause and circumstances of the plaintiff's claims—specifically, that he was arrested

and prosecuted based on false accusations.  See Pl.'s Opp'n, Ex. R (Notice Letter) at 1; see also

Spiller, 302 F. Supp. 3d at 253 ("As to the circumstances of an injury, the notice 'must be

detailed enough for the District to conduct a prompt, properly focused investigation of the

claim.'" (quoting Washington, 429 A.2d at 1366)).    Accordingly, the Court concludes that the

plaintiff's letter to the Mayor was sufficient to put the District on notice as to its potential

liability for Cipullo's alleged actions.    Thus, the Court must address the defendants' remaining

arguments for why the plaintiff's common law claims cannot survive summary judgment.

### 1. The Plaintiff's False Arrest and False Imprisonment Claims (Counts I and II)

Since "[t]here is 'no real difference as a practical matter between false arrest and false

imprisonment,'" Barnhardt, 723 F. Supp. 2d at 214 (quoting Shaw v. May Dep't Stores Co., 268

A.2d 607, 609 n.2 (D.C. 1970)); see Enders v. District of Columbia, 4 A.3d 457, 461 (D.C. 2010)

("'False arrest' is indistinguishable as a practical matter from the common law tort of 'false

imprisonment.'"), the Court will consider the plaintiff's Counts I and II of the Fourth Amended

Complaint together.    The plaintiff bases his false arrest and false imprisonment claims on his

allegation that he was "arrested and unlawfully detained based on the false statements [made] by

[] Cipullo."  4th Am. Compl. ¶ 85.  Because "[t]he elements of a constitutional claim for false

arrest are substantially identical to the elements of a common-law false arrest claim" under

District of Columbia law, Scott v. District of Columbia, 101 F.3d 748, 753 (D.C. Cir. 1996)

(citing Dellums v. Powell, 566 F.2d 167, 175 (D.C. Cir. 1977)),[10] and, because genuine issues of

material fact exist regarding whether probable cause existed to arrest the plaintiff, see supra at

Part III.A.2, the Court must also deny the defendants' motion for summary judgment as to both

---

[10] The parties do not contest that District of Columbia law applies to the plaintiff's common law claims because the
events giving rise to those claims occurred in this jurisdiction.  See 28 U.S.C. § 1346(b)(1); Thomas v. Nicholson,
539 F. Supp. 2d 205, 214 n.6 (D.D.C. 2008).

of the plaintiff's common law false arrest and false imprisonment claims. Cf. District of Columbia v. Minor, 740 A.2d 523, 529 (D.C. 1999) (concluding that, if a court finds a viable constitutional claim of false arrest, then a viable common-law claim naturally follows, and vice versa).

## 2. The Plaintiff's Malicious Prosecution Claim (Count III)

Under District of Columbia law, to support a claim of malicious prosecution, a plaintiff must establish the following:

> (a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) '[m]alice,' or a primary purpose in instituting the proceeding other than that of bringing an offender to justice.

Clark v. District of Columbia, 241 F. Supp. 3d 24, 33 (D.D.C. 2017) (quoting DeWitt v. District of Columbia, 43 A.3d 291, 296 (D.C. 2012)). A malicious prosecution claim can be sustained if the proceeding is "induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." Moore v. Hartman, 571 F.3d 62, 67 (D.C. Cir. 2009); see Amobi, 755 F.3d at 992 (finding that "the malicious prosecution claim should have been submitted to the jury" because the defendants' "lack of good faith and honest belief suggests the primary purpose in instituting and continuing . . . the criminal proceeding was for some purpose 'other than . . . bringing an offender to justice'" when the United States Attorney's Office relied on the defendants' statements).

The defendants move for summary judgment on the plaintiff's malicious prosecution claim, arguing that the plaintiff "has failed to present any evidence to show that [] Cipullo's

report to the police was grounded in malice." Defs.' Mem. at 18.[11] The defendants argue that "Cipullo was shocked when [he was] confronted by [the p]laintiff," Defs.' Mem. at 18, and therefore, "no juror could find that he was not in fear and that hi[s] reporting to the police rose to the level of malice," id. However, contrary to the defendants' position, "[w]hether [] Cipullo made false statements to the police or acted with corrupt intent in making those statements to induce [the p]laintiff's arrest remain questions of disputed material facts[ because the p]laintiff maintains . . . that [] Cipullo falsely claimed that [the p]laintiff was threatening [] Cipullo." Pl.'s Opp'n at 16. Therefore, a reasonable jury could conclude, if it credits the plaintiff's version of what transpired during the November 6, 2014 encounter, that Cipullo acted with "willful, wanton, reckless, or oppressive disregard for the rights of the plaintiff." Pitt, 491 F.3d at 504 (quoting Tyler v. Cent. Charge Serv., Inc., 444 A.2d 965, 969 (D.C. 1982)); see Amobi, 755 F.3d at 993 ("[I]t is axiomatic that malice may be presumed from the lack of probable cause."). Mindful that "[t]he determination of malice [on the part of a defendant] is 'exclusively for the factfinder,'" Pitt, 491 F.3d at 504 (quoting Tyler, 444 A.2d at 969), the Court finds that the plaintiff has presented sufficient evidence from which a reasonable jury could find malice, and therefore, must deny summary judgment as to the plaintiff's common law malicious prosecution claim.

### 3. The Plaintiff's Intentional Infliction of Emotional Distress Claim (Count IV)

The plaintiff alleges that Cipullo's allegedly false statements constituted "extreme and outrageous conduct," 4th Am. Compl. ¶ 120, and that these statements were made with either the "inten[t] to cause [the plaintiff] emotional distress" or in "reckless disregard [for] whether [they]

---

[11] The defendants also argue that the plaintiff "cannot show that there was no probable cause for his arrest." Defs.' Mem. at 18. For the reasons already explained by the Court, see supra at Part III.A.2, genuine issues of material fact exist regarding whether probable cause existed to arrest the plaintiff.

would cause [such distress]," id. ¶ 123.  He further contends that he suffered "emotional hardship, psychological trauma, and severe emotional distress," id. ¶ 124, as a result of these statements.  The defendants argue that "there is an absence of evidence in the record to support [the plaintiff's intentional infliction of emotion distress] claim."  Defs.' Mem. at 19.  Specifically, the defendants claim that "the record does not show any extreme or outrageous conduct committed by [] Cipullo," and that the plaintiff has not "shown that he suffered severe emotional distress."  Id.

  "[I]ntentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  Amobi, 755 F.3d at 995 (quoting Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d 793, 808 (D.C. 2003)).   Conduct is "extreme and outrageous" if it "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious[] and utterly intolerable in a civilized community."  Bernstein v. Fernandez, 649 A.2d 1064, 1075 (D.C. 1991) (citation omitted).  "Where reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."  Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998) (quoting Dreiza v. Vaccaro, 650 A.2d 1308, 1316 (D.C. 1994)).

  The Court disagrees with the defendants' contention that Cipullo's allegedly false allegations do not rise to the level of extreme and outrageous behavior.  See Defs.' Mem. at 19.  If the plaintiff can prove to a jury that Cipullo made "material misstatements" or statements that contained "glaring omissions," causing the arrest of an otherwise innocent man, then the plaintiff will have established that Cipullo engaged in conduct that this Circuit has found to be sufficiently serious for a reasonable jury to conclude that his statements amounts to "extreme and

outrageous" conduct. See Amobi, 775 F.3d at 996 ("As in Pitt, [the defendant's] incident report[, which caused the plaintiff's arrest, allegedly] contained several glaring omissions, and at least one false statement . . . . From these facts, we think it clear that genuine issues of material fact exist and . . . [a] jury [must] determine whether the conduct has been sufficiently extreme and outrageous to result in liability."); see also Carter v. District of Columbia, 795 F.2d 116, 139 (D.C. Cir. 1986) ("[O]utrageous conduct may consist of [the] abuse of [a] position of authority." (quoting Restatement (Second) of Torts § 46 cmt. e (1965))). Having concluded that a reasonable jury could find that Cipullo knowingly made false accusations to the police, the Court is compelled to find that a reasonable jury could go on to find that this conduct was "extreme and outrageous." See Carter, 795 F.2d at 139 ("And a reasonable jury, crediting [the] plaintiffs' account . . . , could well find that [the] officers . . . , in arresting and thereafter filing charges against [the plaintiffs], acted egregiously, intentionally, or recklessly to cause plaintiffs severe emotional distress.").

The Court must also reject the defendants' counterargument that the plaintiff has not "shown that he suffered severe emotional distress." Defs.' Mem. at 19. The plaintiff has identified evidence that he was "arrested, [ ] incarcerated for over ten hours, had existing injuries [] exacerbated by his incarceration, . . . under[went] costly court proceedings, and faced the emotional pain and humiliation of [allegedly] fabricated criminal allegations." Pl.'s Opp'n at 29; see Pl.'s Facts ¶¶ 30–33; Pl.'s Opp'n, Ex. A (Stephens Jiggetts Dep.) 192:5–22, 194:12–16, 202:6–203:12. Based on this evidence, a reasonable jury could conclude that the plaintiff suffered severe emotional distress. See Hall v. District of Columbia, 867 F.3d 138, 150 (D.C. Cir. 2017) ("A reasonable jury could find it foreseeable that an unjustified arrest, even without excessive force, would cause some modicum of the physical and emotional harm . . . . Arrest

without justification can be deeply disturbing, and arrest itself often involves some physical discomfort, unnatural restraint, and forceful handling."). In addition, the Court is mindful that evidence of severe emotional injury may be difficult to produce and that, "in many cases[,] the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." Homan v. Goyal, 711 A.2d 812, 821 (D.C. 1998) (quoting Restatement (Second) of Torts § 46 cmt. j (1965)).

For all of these reasons, the Court must conclude that it is inappropriate to grant summary judgment against the plaintiff with respect to his intentional infliction of emotional distress claim.

### 4. The Plaintiff's Slander Claim (Count V)

The plaintiff bases his slander claim on his allegations that Cipullo "made false and defamatory statements concerning [the p]laintiff [], [] with regards to the events of November 6, 2014," 4th Am. Compl. ¶ 131, and that he "published [these] false statements without privilege to a third party," id. ¶ 132.

To prevail on a claim of slander in the District of Columbia, a plaintiff must show: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either the statement was actionable as a matter of law irrespective of special harm or its publication caused the plaintiff special harm. See Klayman v. Segal, 783 A.2d 607, 613 (D.C. 2001). A statement is defamatory as a matter of law ("defamatory per se") if it is so likely to cause degrading injury to an individual's reputation that proof of that harm is not required to recover compensation. Carey v. Piphus, 435 U.S. 247, 262 (1978). However, a statement may be qualifiedly privileged if the communication was "one made in good faith upon a subject matter in which the party

communicating [it] has an interest or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty." May Dep't Stores Co. v. Devercelli, 314 A.2d 767, 773 (D.C. 1973); see Carter v. Hahn, 821 A.2d 890, 894 (D.C. 2003) (finding that District of Columbia law provides a "qualified privilege" to any person who reports a crime, as long as the "statement about suspected wrongdoing is made in good faith to law enforcement authorities." (quoting Columbia First Bank v. Ferguson, 665 A.2d 650, 655 (D.C. 1995)). A defendant is "fore[]close[d] [from] asserting the privilege," when the statement was made with "malice, which, within the context of the common interest privilege, is 'the equivalent of bad faith.'" Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 858 (D.C. Cir. 2006) (quoting Moss v. Stockard, 580 A.2d 1011, 1025 (D.C. 1990)); see Carter, 821 A.2d at 894 (stating that no privilege attaches to a statement made "without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." (quoting Columbia First Bank, 665 A.2d at 656)).

Although the defendants do not contest that "Cipullo accused [the p]laintiff of having committed a crime against him," Defs.' Mem. at 20, they argue that the "[p]laintiff has not demonstrated that he was injured in his trade, profession[,] or community standing, or lowered in the estimation of the community." Defs.' Mem. at 20. As the plaintiff correctly argues, however, "[c]harging another with a crime—which [the d]efendants concede [] [Cipullo] did to [the p]laintiff—is actionable per se." Pl.'s Opp'n at 30 (emphasis removed); see Hall, 867 F.3d at 149 (finding "a viable defamation claim because a reasonable jury could find on this record that [the defendants] acted in bad faith by reporting [the plaintiff] to the police as having committed felony theft"). Therefore, the plaintiff need not show special harm, see, e.g., Von

Kahl v. Bureau of Nat. Affairs, Inc., 934 F. Supp. 2d 204, 218–19 (D.D.C. 2013), unless the statement, at the time made, was qualifiedly privileged, see Carter, 821 A.2d at 894.[12]

The defendants argue that "Cipullo has a qualified privilege for the report he made to the police," Defs.' Mem. at 20, because the "[p]laintiff has not shown that [] Cipullo acted without just cause or excuse and therefore judgment should be entered in favor of the[] [d]efendants on this claim," id. at 21. Specifically, the defendants claim that "Cipullo had a good faith belief that he had been threatened by [the p]laintiff and had a legitimate interest in communicating this threatening behavior to the police." Defs.' Mem. at 20.[13] However, because the Court has already concluded that a genuine factual issue exists with respect to whether Cipullo acted with malice when he leveled his allegedly false accusations against the plaintiff, see supra at Part III.A.2, the question of whether Cipullo acted with qualified privilege cannot be resolved at the summary judgment stage. See Mastro, 447 F.3d at 858. Consequently, summary judgment in favor of the defendants on the plaintiff's slander claim must be denied.

---

[12] The defendants contend that the plaintiff "did not plead slander per se; rather he simply ple[aded] slander, and should not be able to proceed under a theory of slander per se." Defs.' Reply at 19. However, "'[t]he liberal concepts of notice pleading embodied in the Federal Rules do not require the pleading of legal theories,' but instead require only the pleading of basic factual allegations." Rahman v. Johanns, 501 F. Supp. 2d 8, 16–17 (D.D.C. 2007) (quoting Empagran S.A. v. F. Hoffman–LaRoche, Ltd., 388 F.3d 337, 341 (D.C. Cir. 2004)). Therefore, the plaintiff had no obligation to plead the legal theory upon which he intended to rely to establish his slander claim.

[13] The defendants argue that Cipullo did not make "his allegations with a reckless disregard for the truth" because he "reported what he actually heard or believed [that] he heard" and, for this reason, the plaintiff should not be able to proceed on his slander claim "without any proof of actual harm to [his] reputation in the community or his trade or profession." Defs.' Reply at 19. This argument has no merit. A claim of "defamation per se[] require[s] no showing of special[, i.e. reputation,] damages." Westfahl v. District of Columbia, 75 F. Supp. 3d 365, 375 (D.D.C. 2014). It is true that a plaintiff who is a public figure may only recover presumed (as opposed to special) damages upon a showing of actual malice. See, e.g., Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974). But, "[w]here a plaintiff is neither a public official nor a public figure, and where the defamatory statements involve no issue of general public importance, proof of defamation per se entitles the injured party to presumed [ ] damages." El-Hadad v. Embassy of United Arab Emirates, No. 96-cv-1943, 2006 WL 826098, at *15 (D.D.C. Mar. 29, 2006), rev'd on other grounds, 496 F.3d 658 (D.C. Cir. 2007); see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 757, 760–61, 763 (1985) ("We conclude that permitting recovery of presumed . . . damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern."). The plaintiff, a retired police officer, is unquestionably a private figure and therefore need not prove actual malice to recover presumed damages in this case.

**C.     The Plaintiff's <u>Bivens</u> Claim**

Under <u>Bivens</u>, "a[ ] plaintiff may pursue a lawsuit for damages against federal officials in their personal capacities for constitutional violations." <u>Jordan v. District of Columbia</u>, 113 F. Supp. 3d 278, 280 (D.D.C. 2015). Thus, to establish a <u>Bivens</u> claim, "the plaintiff must establish that (1) the defendant violated a federal constitutional right of the plaintiff; (2) the right was clearly established; (3) the defendant was a federal actor by virtue of acting under color of federal law; and (4) the defendant was personally involved in the alleged violation." <u>Berman v. Crook</u>, 293 F. Supp. 3d 48, 55 (D.D.C. 2018) (citations omitted). A <u>Bivens</u> action "is the federal-actor analog to § 1983 suits brought against state officials." <u>Hartman v. Moore</u>, 547 U.S. 250, 255 (2006); <u>see also</u> <u>Patterson v. United States</u>, 999 F. Supp. 2d 300, 308 (D.D.C. 2013).

Here, the plaintiff bases his <u>Bivens</u> action on his allegation that "Cipullo . . . deprived [him] of clearly established rights protected by the Fourth Amendment," 4th Am. Compl. ¶ 159, or, in the alternative, "deprived [him] of his liberty when [] Cipullo used his position and federal authority as a Director of the Superior Court of the District of Columbia Criminal Division to cause [the p]laintiff to be detained and arrested in violation of his right to be free from unreasonable restrictions on his liberty interests," <u>id.</u> ¶ 161. The defendants contend that the "[p]laintiff's <u>Bivens</u> action against [Cipullo] cannot be maintained . . . [because] Cipullo is <u>not</u> a federal actor." Defs.' Mem. at 6. The plaintiff responds that "given the complex nature of D.C. law, it is still in dispute whether [] Cipullo could [] be considered a federal actor." Pl.'s Opp'n at 19. The Court disagrees with the plaintiff and concludes that summary judgment is appropriate on the plaintiff's <u>Bivens</u> claim because the plaintiff has not produced any evidence to support that Cipullo acted under color of federal law.

Notably, the plaintiff concedes that Cipullo is an employee of the Superior Court, see Defs.' Mem., Ex. F (The Plaintiff's Answers to Defendant Cipullo's Second Set of Interrogatories and the District of Columbia's First Set of Interrogatories ("Pl.'s Answer to 2d Interrogs.")) at 5, and although the Superior Court is a "federal" creation, the "case law and other federal statutes [generally] treat the D.C. courts like state courts," Handy v. Shaw, Bransford, Veilleux & Roth, 325 F.3d 346, 351 n.5 (D.C. Cir. 2003); see JMM Corp. v. District of Columbia, 378 F.3d 1117, 1125 (D.C. Cir. 2004) ("Congress has made clear that it intends federal courts generally to treat the District of Columbia judicial system as if it were a state system, an intent that this circuit has long respected and effectuated.").  The plaintiff argues that Cipullo nonetheless may have been clothed in federal authority because "the power ultimately and illegally invoked by [] Cipullo's complaints and actions was that of the U.S. Attorney's [O]ffice."  Pl.'s Opp'n at 20.  However, such conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  See Ass'n of Flight Attendants v. Dep't of Transp., 564 F.3d 462, 465–66 (D.C. Cir. 2009); see also Fed. R. Civ. P. 56(c)(1) (stating that in order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute).

To the extent that the plaintiff argues that Cipullo engaged in joint activity with the United States Attorney, see Brentwood, 531 U.S. at 296, in order for Cipullo's actions to be characterized as federal action, the plaintiff must show overt and significant participation by the United States Attorney's Office, which the plaintiff has not done.  In fact, the record does not

reflect that Cipullo had any contact with the United States Attorney. The only evidence provided by the plaintiff that shows involvement by the United States Attorney's Office in the plaintiff's case is an email from United States Attorney Machen to Judge Satterfield, indicating that he believed that these accusations were "obviously a serious matter" and that he would have "someone follow up with Cipullo regarding the incident." Pl.'s Opp'n, Ex. M (Superior Court Emails II) at 1. However, this evidence, without more, does not, contrary to the plaintiff's assertion, show that "the power ultimately and illegally invoked by [] Cipullo's complaints and actions was that of the U.S. Attorney's [O]ffice." Pl.'s Opp'n at 20. The plaintiff has failed to provide any evidence from which a reasonable juror could find that Cipullo participated in joint activity with the United States Attorney's Office.

Because the plaintiff has not established that Cipullo was a federal actor in regard to the acts that resulted in the plaintiff's arrest, detention, and prosecution, the defendants' motion for summary judgment on the plaintiff's <u>Bivens</u> claim is granted.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that summary judgment is not warranted on the plaintiff's constitutional and common law false arrest and malicious prosecution claims as well as on the plaintiff's common law claims for intentional infliction of emotional distress and slander. However, the Court concludes that summary judgment for the defendants must be granted on the plaintiff's <u>Bivens</u> cause of action against Cipullo. Accordingly, the Court will grant in part and deny in part the defendants' motion for summary judgment.

**SO ORDERED** this 23rd day of April, 2019.[14]

REGGIE B. WALTON
United States District Judge

---

[14] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.